IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| KRISSY SANCHEZ, | Cause No. CV 18-91-BLG-SPW-TJC |
| Plaintiff, | |
| vs. | ORDER and FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE |
| FRIEDEL, LLC; NEIL FRIEDEL; DOUGLAS FRIEDEL; CHRIS FRIEDEL; RICH FRIEDEL, | |
| Defendants. | |

Plaintiff Krissy Sanchez filed this action in June 2018, challenging defendants' actions in connection with drug testing[1] conducted by one or more of them after Sanchez was referred to them by a social worker at Child Protective Services ("CPS").  Sanchez, who is representing herself, brought claims under 42 U.S.C. § 1983 and state law.

## I.  Factual Background

This case is the third of three federal lawsuits Sanchez filed in 2017 and 2018.  All three cases arose from events underlying proceedings in state court concerning the custody of one of Sanchez's children.  In this case, Sanchez alleges

---

[1]  Sanchez objects to use of the word "testing."  The Court does not intend to convey anything of legal significance when it calls the practice of using devices to detect the presence of controlled substances "drug testing."

Case 1:18-cv-00091-SPW-TJC   Document 56   Filed 07/22/20   Page 2 of 35

that Defendants Friedel LLC and Neil, Douglas, Chris, and Rich Friedel are liable to her based on their role in administering drug tests at social workers' request.

Neil, Chris, and Rich Friedel are members of Friedel LLC. Douglas Friedel is an employee of Friedel LLC but not a member. *See* N. Friedel Aff. (Doc. 43-1) at 1 ¶ 3; C. Friedel Aff. (Doc. 43-2) at 1 ¶ 2; R. Friedel Aff. (Doc. 43-3) at 1 ¶ 2; D. Friedel Aff. (Doc. 43-4) at 1 ¶ 2.

On September 1, 2017, Chris Friedel accompanied a social worker to Sanchez's home. *See, e.g.*, Sanchez Aff. (Doc. 48-6) at 10–12. On the same day, CPS took temporary legal custody of one of Sanchez's children. (The events of this day underlie the first-filed federal case.) This occasion was the first relevant interaction between Sanchez and a Friedel defendant. Sanchez says Chris was present on later occasions when she was in the offices of Friedel LLC, *see* Pl. Statement of Disputed Facts ("SDF") (Doc. 48) at 18–19 ¶ 36, but she does not claim they interacted. At any rate, unsupported assertions in a Statement of Disputed Facts are not evidence and will be disregarded. *See* Fed. R. Civ. P. 56(c)(1). The undisputed evidence shows this occasion was both the first and the last interaction between Sanchez and Chris Friedel. *See* C. Friedel Aff. (Doc. 43-2) at 1–2 ¶¶ 3–4.

On September 14, 2017, Sanchez went to a State office to visit her child. A social worker who saw her there apparently believed Sanchez might be "drunk."

2

The worker contacted Friedel LLC.  Neil Friedel traveled to the State office to administer a test.  *See* Second Am. Compl. (Doc. 38) at 2, 7; *cf.* Pl. SDF (Doc. 48) at 6–7 ¶ 10.[2]  Sanchez alleges the social worker acted "outside of policy and procedures," Pl. SDF (Doc. 48) at 4–5 ¶ 9, but she points to no evidence supporting this assertion.

The worker told Sanchez, in front of Neil Friedel, that she must submit to testing or she could not visit her child.  Neil Friedel administered two tests, a breathalyzer to detect alcohol and, allegedly on his own initiative, a "Drager device" to detect drugs.  *See* Sanchez Aff. (Doc. 48-6) at 12–13; Pl. Exhs. (Doc. 48-2) at 6, 7; N. Friedel Aff. (Doc. 43-1) at 2 ¶¶ 7–9.

Sanchez also alleges that, on one occasion, evidently during the same September 14 interaction, Neil Friedel photographed Sanchez taking a breathalyzer test.  *See* Second Am. Compl. (Doc. 38) at 3.

Shortly after the September 14 incident, the state court handling the custody matter ordered Sanchez to submit to random testing[3] for drug use.  Several businesses in Billings provide such drug testing services.  CPS chose Friedel LLC

_____

[2] As noted, the SDF is not evidence.  It is also not a pleading.  But it contains the clearest statement the Court has found of the events Sanchez claims occurred on September 14.

[3] Sanchez claims the state court specifically required urinalysis, *see* Pl. SDF (Doc. 48) at 10 ¶ 15, but she did not file the order, and the SDF is not evidence.  In another of her cases, she filed an order requiring her to "obtain chemical dependency evaluations and submit to drug testing through random testing."  That order does not mention urinalysis.  *See* Ex. 1 (State Court's Order to Show Cause at 4 ¶ 8(f)), *filed with* Pl. Mot. for Leave and Reply (Doc. 104-1 at 20, 45), *Sanchez v. Rash*, No. CV 17-156-BLG-SPW-TJC (D. Mont. filed Feb. 15, 2020).

to administer the tests in Sanchez's case.  Consistent with its usual practice, CPS contacted Friedel, told them what services were needed, and had Sanchez get in touch with them.  *See* Second Am. Compl. (Doc. 38) at 2; N. Friedel Aff. (Doc. 43-1) at 2–3 ¶¶ 10–15; Pl. SDF (Doc. 48) at 10 ¶ 16.  There is no evidence, and Sanchez does not allege, that Friedel LLC or any individual Friedel played any role in CPS's choice.  *See, e.g.*, N. Friedel Aff. at 3 ¶ 21.  Competent evidence shows there was no contract between CPS and the Friedels at the time.  CPS worked with other providers, and the Friedels worked with other clients.  *See id.* at 1 ¶ 4, 3 ¶¶ 16–20; *see also* Fed. R. Evid. 602.[4]

CPS selected "sweat patches," through a manufacturer called PharmChem, as the mode of testing in Sanchez's case.  *See* N. Friedel Aff. at 2 ¶¶ 12–13.  Sanchez alleges either that she objected to the sweat patch or that she would have objected had she known a false result was possible.  *Compare* Second Am. Compl. (Doc. 38) at 2 *with* Sanchez Aff. (Doc. 48-6) at 15, 16.

Throughout Sanchez's testing period, Neil Friedel applied and removed most of her sweat patches.  *See* N. Friedel Aff. (Doc. 43-1) at 5 ¶ 32.  Douglas

---

[4]  Sanchez refers to a contract between CPS or at least some governmental entity and the Friedels, but she relies on a newspaper article.  *See* Pl. SDF (Doc. 48) at 13–14 ¶ 22; Pl. Exhs. (Doc. 48-2) at 20.  The article is hearsay and lacks foundation and authenticity.  *See, e.g.*, Fed. R. Evid. 801(c), 805, 901; *Stewart v. Wachowski*, 574 F. Supp. 2d 1074, 1-90–91 & n.75 (C.D. Cal. 2005); *compare, e.g.*, *ZW USA, Inc. v. PWD Sys., LLC*, 889 F.3d 441, 449 n.7 (10th Cir. 2018).  In addition, the article is irrelevant.  It is dated May 2015, and the relevant time period in this case is September 2017 through May 2018.

Friedel removed one patch under Neil's supervision.  *See id*. ¶ 33; D. Friedel Aff.

(Doc. 43-4) at 2 ¶ 3.  Once removed, the patches were sent to Clinical Reference

Laboratory for analysis.  *See* N. Friedel Aff. at 4 ¶¶ 24–25; Second Am. Compl.

(Doc. 38) at 2.  Throughout the testing period, the testing procedures remained the

same.[5]  *See* N. Friedel Aff. at 4 ¶ 24, 5 ¶ 34, & Ex. A.

At Friedel LLC, the waiting room featured a large television tuned to

religious programming.  Sanchez was not permitted to wear headphones in the

waiting room and could not sit in a location where she could avoid seeing the

television.  She was unable to avoid religious messages because failure to appear

for drug testing could jeopardize her ability to regain custody of her child.  *See*

Sanchez Aff. (Doc. 48-6) at 17; Second Am. Compl. (Doc. 38) at 3, 13.

At some point, both Neil and Rich Friedel attended a "family engagement

meeting" involving Sanchez, her attorney, and social workers.  *See* Pl. Exhs. (Doc.

48-2) at 8.  Sanchez (and/or her attorney) objected to the Friedels' participation as

unusual, asserting that the results could have been delivered in writing.  The

Friedels reported the results of Sanchez's drug tests and departed.  *Cf.* Pl. SDF

(Doc. 48) at 19–22 ¶ 36, 28–29 ¶ 41.

---

[5]  Sanchez asserts that initially, her tests at Friedel LLC were administered by a female employee whom she liked.  After she sued Chris Friedel in November 2017, she was not permitted the see the same employee, and Neil Friedel was less friendly.  *Cf.* Pl. SDF (Doc 48) at 22–23 ¶ 37.  But the SDF is not evidence, and these assertions do not appear in the Second Amended Complaint or Sanchez's affidavit.  They also appear insignificant.

On April 11, 2018, Friedel LLC reported to CPS that one of Sanchez's sweat patches tested positive for methamphetamine.  *See* N. Friedel Aff. (Doc. 43-1) at 4–5 ¶ 30.  Sanchez claims the positive result from her sweat patch came from environmental contamination from her job or her new residence or from Friedel LLC's offices.  There is no dispute that such contamination is a viable explanation. Sanchez does not allege any Friedel defendant tampered with the result.  In response to the positive result, one or more social workers, local law enforcement, and Neil Friedel went to Sanchez's home on April 16, 2018.  Using the portable Drager device again, Friedel conducted an "on the spot" drug test.  It was negative. *See id.* at 5 ¶ 31.

"[M]ultiple times," Sanchez asked CPS to reassign her to a different testing company or entity.  *See* Sanchez Aff. (Doc. 48-6) at 10.  It is not clear when or how many times she made these requests.  There is no evidence, and Sanchez does not allege, that Friedel LLC or any individual Friedel played any role in denying reassignment or did anything to resist Sanchez's reassignment.

On April 30, 2018, CPS terminated Friedel LLC from Sanchez's case, and reassigned her to a provider closer to her home.  *See* N. Friedel Aff. (Doc. 43-1) at 5 ¶ 35.

In May or June 2018, the state court dismissed CPS's petition, and Sanchez regained custody of her child.  The evidence is undisputed that no Friedel

defendant contributed to any decision CPS made in Sanchez's case.  *See* N. Friedel

Aff. (Doc. 43-1) at 5–6 ¶¶ 37–40.

## II.  Procedural Background

Sanchez filed this action on June 4, 2018.  After she amended her complaint,

Defendants filed an answer on August 2, 2019.

On October 28, 2019, Sanchez filed a document titled "Objection to [S]tate

releasing Cps file"; that is, the file of Child Protective Services.  The document

listed the case numbers of all three actions Sanchez had filed.  The State of

Montana is not a party in any of the three actions.  As to the defendants in this

case, the "Objection" appeared to argue that none of them should be permitted to

review the CPS file.  Defendants responded by pointing out that Sanchez claimed

their actions caused her harm in the custody action.

The defendants in all three actions had not yet responded to that motion

when, on November 8, 2019, Sanchez moved for leave to amend her amended

complaint in this matter.  She did not attach a proposed pleading.  Two weeks later,

on November 21, 2019, she submitted a proposed second amended complaint.

On November 22, 2019, Defendants moved for summary judgment on the

then-controlling pleading; that is, the first amended complaint (Doc. 12-1).  They

argued that they cannot be liable to Sanchez under 42 U.S.C. § 1983 because they

did not act under color of State law.  They also asked the Court to decline to

7

exercise supplemental jurisdiction over state-law claims.

On November 27, 2019, the Court granted Sanchez's motion to amend and deemed the second amended complaint the controlling pleading.  The Court also explained it would consider the Friedels' motion for summary judgment in light of the second amended complaint.  The summary judgment motion was fully briefed on January 3, 2020.

The second amended complaint abandons Sanchez's prior allegation that a drug-testing device was administered in a sexually harassing manner.  *Compare* Am. Compl. (Doc. 12-1) at 1 para. 2, 4 para. 3, *with* Second Am. Compl. (Doc. 38) at 1–16; *see also* Sanchez Aff. (Doc. 48-6) at 1–19 (omitting any allegation of sexual harassment).  Sanchez also abandons her previous allegation that someone retaliated against her by inflicting physical pain on her.  *Compare* Am. Compl. (Doc. 12-1) at 4 para. 3; Compl. (Doc. 2) at 10 para. 2, *with* Second Am. Compl. (Doc. 38) at 1–16; Sanchez Aff. (Doc. 48-6) at 1–19.  As any further amendment would be untimely, the Court will not discuss the abandoned allegations and will recommend they be dismissed with prejudice.  *See Lacey v. Maricopa County*, 693 F.3d 896, 928 (9th Cir. 2012).

The second amended complaint added to Sanchez's § 1983 claims another claim based on federal law; that is, the civil provision of the Racketeer-Influenced and Corrupt Organizations Act ("RICO").  *See* 18 U.S.C. § 1964(c).  It also added

8

several claims under state law.  And, after the motion for summary judgment was fully briefed, Sanchez filed a motion for extension of time and a motion to continue.

In sum, five issues are presented, and the Court will address them in the following sequence:

First, does Sanchez state a RICO claim on which relief may be granted?

Second, with respect to Sanchez's civil rights claims under 42 U.S.C. § 1983, are all Defendants entitled to summary judgment on the grounds they did not act under color of state law?

Third, should the Court exercise supplemental jurisdiction over any claims arising under state law?

Fourth, is Sanchez's objection to disclosure of the State's CPS file well-taken?

And finally, should Sanchez receive an extension of time or a continuance?

### III.  Civil RICO Claim

Because Sanchez is proceeding in forma pauperis, the Court must dismiss allegations in the second amended complaint that are frivolous or that fail to state a claim on which relief may be granted.  *See* 28 U.S.C. § 1915(e)(2)(B)(i), (ii).  The Court has previously reviewed the amended complaint with respect to Sanchez's § 1983 claim, *see* Order (Doc. 14), and now must do so with respect to the newly

pled civil RICO claim.

To support the claim, Sanchez must allege facts sufficient to support an inference that the Defendants engaged in a "pattern of racketeering activity."  18 U.S.C. §§ 1964(c), 1962.  "Racketeering activity" is defined by a long but specific list of offenses.  *See* 18 U.S.C. § 1961(1).  Sanchez names many offenses in her second amended complaint.  The caption lists several purported causes of action, including fraud, extortion, constitutional violations, and tampering with evidence.  *See* Second Am. Compl. (Doc. 38) at 1.  The complaint also mentions conspiracy to kidnap, trespassing, unlawful restraint, battery, civil rights violations, human trafficking, and witness tampering.  *See id.* at 5.

First, several of these alleged offenses do not support a RICO claim. Trespassing, civil rights violations, and battery, assault, or unlawful use of physical force, *see* Second Am. Compl. at 1 (caption ¶ 7), 5, are not "racketeering activity," 18 U.S.C. § 1961(1).  In addition, Sanchez's allegations suggest no support for an inference that anyone engaged in human trafficking or tampering with a witness or evidence.  *See* 18 U.S.C. § 1961(1); Second Am. Compl. at 1 (caption ¶ 10), 5.

Kidnapping is racketeering activity, provided it is "punishable by imprisonment for more than one year" under State law.  *See* 18 U.S.C. § 1961(1). But advising someone that custody of their children depends on their not using drugs, *see* Second Am. Compl. at 12, is not kidnapping or conspiracy to kidnap.

10

Sanchez also mentions unlawful restraint.  It is not punishable by imprisonment for more than a year.  *See* Mont. Code Ann. § 45-5-301(2).  Unlawful restraint is an element of kidnapping, a felony, *see id*. § 302(1), (2), but the facts of this case suggest the Defendants acted *with* lawful authority, i.e., at CPS's invitation, not "without lawful authority" as required by Montana's kidnapping statute, *see id*. § 302(1).

With respect to extortion, a person may commit felony theft under Montana law by obtaining property by threat or deception, *see* Mont. Code Ann. § 45-6-301(2), or by deceptive practices, *see id*. § 45-6-317(1), (2)(b), (c).  Both are reasonably equivalent to common-law extortion.  *See* 18 U.S.C. § 1961(1).  The facts of this case do not remotely suggest Defendants know their tests fail to perform as promised.  On the contrary, Sanchez alleges the tests are too sensitive.  Further, neither obtaining payment for services rendered, nor any of the acts of which Sanchez complains, can plausibly be described as intended to wrongfully deprive another of his property.  Thus, the allegations do not create an inference that the Defendants committed theft or extortion.  *See, e.g.*, Mont. Code Ann. §§ 45-6-303(1), 45-2-101(20); *State v. Mills*, 2018 MT 254 ¶¶ 20–23.

Sanchez also mentions fraud.  *See* Second Am. Compl. at 1 (caption), 4, 14, 16.  Racketeering includes many kinds of fraud.  Sanchez asserts Defendants are not a law enforcement agency or law enforcement officers.  She also asserts that

11

they provide government agencies with testing services designed to differentiate

those who did not violate a particular law from others who appear to have done so.

Their acts are wrongful, she contends, because the devices they use are regarded by

the manufacturer as "for law enforcement only."  The Court fails to see the point.

These allegations do not raise an inference that Defendants committed a fraud

listed in § 1961(1).

Sanchez also claims the Friedels "associate closely with" social workers,

hear about potential clients from them, offer drug testing services from which they

obtain income, and thereby enhance social workers' case loads and the money they

or CPS or the State obtain through grants or perhaps funding from the Montana

Legislature.  *See, e.g.*, Second Am. Compl. at 4, 6–7.  Assuming they are true,

these facts are wholly unremarkable.

Sanchez may or may not be correct that Defendants ought to change their

practices or their threshold for what constitutes a "positive" test.  The Court offers

no opinion.  But her allegations fall so far short of showing "racketeering" as to

indicate bad faith.  No further amendment should be permitted.  Sanchez's RICO

claim should be dismissed with prejudice as frivolous.

## IV.  42 U.S.C. § 1983

A claim under 42 U.S.C. § 1983 has two elements.  First, the plaintiff must

prove the defendant deprived her of a constitutional right; and second, she must

prove the defendant acted under color of state law.  *See* 42 U.S.C. § 1983; *West v. Atkins*, 487 U.S. 42, 48 (1988).  The Defendants' motion for summary judgment focuses on the second element.

Generally, the United States Constitution protects people against state action, not against action by private parties.  But a private party can be held liable under § 1983 if its conduct is "fairly attributable to the State."  *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982).  The Friedels argue that their conduct was not fairly attributable to the State.  If they are correct, they are entitled to judgment, even if their conduct would violate the Constitution had a state officer or employee engaged in it.

### A.  Sanchez's Allegations

As relevant to § 1983, Sanchez alleges:

- Defendants administered drug tests at CPS's request and required her to wear a sweat patch "for the duration of her children's removal" instead of complying with what she claims was a court order requiring urinalysis tests, *see* Second Am. Compl. (Doc. 38) at 2, 7 (implicating the Fourth Amendment's prohibition against unreasonable searches);

- Neil Friedel acted without her permission when he photographed her using a breathalyzer and tricked her by using a device at one session to screen her for both alcohol use and drug use, *see, e.g.*, *id.* at 3 (Fourth and/or Fourteenth Amendment);

- Defendants used CPS's requirement for drug testing as an opportunity to proselytize Sanchez or compel her to hear their religious beliefs, *see, e.g.*, *id.* at 3, 13 (First Amendment);

- Defendants retaliated against her for naming Chris Friedel in a federal

lawsuit in November 2017 by continuing to conduct her drug testing, by altering the personnel she saw and changing their attitude toward her after she sued, and by defending the integrity of their drug test results, *see, e.g.*, *id.* at 12, 15–16 (First Amendment).

As relevant to the relationship between State officials or employees and the

Defendants, Sanchez alleges:

[P]laintiff had been given a paper from the local cps that had Friedel listed as the agency and was forced she must make contact with and complete urinary analysis with this agency only even though many others are in the community. . . .

The defendants have close relationships with multiple individuals employees at Cps Defendant Neil is married to A therapist with direct information to Families in crisis and social workers with in Yellowstone.  The friels associate closely with social workers  These social workers receive bonus & incentives federal funding when they obtain placements and meet the deadlines required.  The social workers profit 3:1 match's financially for the debts bank account.  The Defendants Friedel's began to work closer with social workers as there agency was bailing out individuals who now would have Cps cases.
. . .

Plaintiff refused engagement of the fridels in initial contact at her home in September 2017, they however continued to force their product on Plaintiff they were friends with a social worker at dphhs and would simply show up at her request Plaintiff told them she was not there by choice and didn't want to use their business Plaintiff was told her child wouldn't be seen if she did not use them specifically. Plaintiff attempted multiple times to end the contact and each time was threatened with loss of child contact.

Second Am. Compl. (Doc. 38) at 2, 4, 15 [sic throughout].

### B.  Summary Judgment Standards

The Court will grant summary judgment if the Friedels show "there is no

genuine dispute as to any material fact" and they are "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are those which may affect the outcome of the case.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable juror to return a verdict in Sanchez's favor.  *Id.*

The Friedels have the initial burden to submit evidence demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If they meet this initial responsibility, the burden shifts to Sanchez to establish a genuine issue of material fact.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In attempting to establish the existence of a factual dispute, Sanchez must "go beyond the pleadings and by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex Corp.*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e), now 56(c)(1)).

### C.  Analysis

Sanchez would not have come into contact with the Friedels were it not for CPS's initiation of an investigation into the welfare of Sanchez's children, and CPS's requirement that Sanchez regularly obtain drug tests.  But these facts alone do not subject the Friedels to liability under § 1983.

For instance, in *Kirtley v. Rainey*, 326 F.3d 1088 (9th Cir. 2003), a

Washington state court appointed a guardian, defendant Rainey, for a young girl named Nicole.  Rainey investigated whether Nicole's best interests would be served by remaining in Kirtley's custody or by returning to her mother.  After Kirtley lost custody, she sued Rainey under 42 U.S.C. § 1983, alleging that Rainey and others conspired to falsify evidence and ensure Nicole wound up with her mother.  *See Kirtley*, 326 F.3d at 1091–92.

The court held that Rainey could not be sued under § 1983 because she did not act under color of state law.  Similar to Sanchez, Kirtley never would have come into contact with Rainey but for the State's investigation and the state court's appointment of Rainey.  But the court did not ask whether Kirtley's involvement with Rainey came about because of state action or whether Rainey's court appointment put her in a position to harm Kirtley.

Instead, as the court explained, a private party's involvement with government actors generally does not mean the private party's actions amount to state action.  The question is whether "there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself."  *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001).

> What is fairly attributable [as state action] is a matter of normative judgment, and the criteria lack rigid simplicity.  From the range of circumstances that could point toward the State behind an individual face, no one fact can function as a necessary condition across the

> board for finding state action; nor is any set of circumstances
> absolutely sufficient, for there may be some countervailing reason
> against attributing activity to the government.

*Id.* at 295–96; *see also, e.g.*, *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722–24 (1961) (reviewing numerous facts and finding a sufficient "degree of state participation and involvement in discriminatory action" to find private party acted under color of state law).

*Kirtley* identified four different tests, or ways of looking at the relationship between state and private actors, that may reveal whether a private party acted under color of law:  "(1) public function; (2) joint action; (3) governmental compulsion or coercion; and (4) governmental nexus."  *See* 326 F.3d at 1092 (internal quotation marks and citation omitted).  *Kirtley* addressed each of the four tests in turn.  This Court will do the same.

### 1. Public Function

Under the "public function" test, "the question is whether the function performed has been traditionally the *exclusive* prerogative of the State."  *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 353 (1974)) (emphasis in *Rendell-Baker*).  As applied here, this test asks whether drug testing has traditionally been performed only by the State, to the exclusion of private entities.

In *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149 (1978), a city marshal

17

supervised Ms. Brooks' eviction from her apartment.  He called Flagg Brothers to load, move, and store her furniture.  Brooks sued Flagg Brothers for selling her furniture to cover its costs when she could not afford to pay them.  Because Flagg Brothers acted at the request of the city marshal, Brooks claimed they acted under color of state law. *See id*. at 153.  The Supreme Court concluded that, because "the settlement of disputes between debtors and creditors is not traditionally an exclusive public function," Brooks could not show any state action, and Flagg Brothers was not acting under color of state law under 42 U.S.C. § 1983.  *Flagg Bros.*, 436 U.S. at 161–63 & n.11; *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 930–31 (1982).

Drug testing generally, drug testing of parents whose children are temporarily in state custody, reporting results, or testifying about results in court[6] are not traditional or exclusive functions of government.  Drug testing is common among private employers, private schools, and professional athletic associations, to name just a few non-governmental organizations.  Sanchez's allegations against the Friedels do not meet the public function test.

### 2.  Joint Action or Conspiracy

A private party may be liable under § 1983 for acts undertaken in concert or

---

[6]  There is no indication the Friedels testified against Sanchez, but she seems to suggest they were prepared to do so.

in conspiracy with state officials or employees.  *See, e.g.*, *Lugar*, 457 U.S. at 939, 942 (holding that company did not act under color of state law merely by following state statutes but acted under color of state law by "invoking the aid of state officials to take advantage of state-created attachment procedures"); *Adickes v. S.H.  Kress & Co.*, 398 U.S. 144, 169–71, 173–74 (1970) (holding that restaurant is liable when acting in concert with law enforcement officer to enforce racial segregation by refusing to serve customer); *United Steelworkers v. Phelps Dodge Corp.*, 865 F.2d 1539, 1546 (9th Cir. 1989) (en banc) (holding that reasonable jury could find evidence that private mining company did not merely cooperate with public officials but urged them to make arrests without probable cause and set high bail).  "[T]he focus of our inquiry is not on whether the state exercises control over a putative state actor [that is, one of the Friedels] as a general matter, but whether the state has exercised control over the particular conduct that gave rise to the plaintiff's alleged constitutional deprivation."  *Kach v. Hose*, 589 F.3d 626, 649 (3d Cir. 2009).

To determine whether Sanchez's allegations meet this test, the Court must consider the occasions when a Friedel defendant interacted with Sanchez.

### a.  September 1, 2017

Chris Friedel arguably acted under color of state law on September 1, 2017, when he accompanied a social worker to Sanchez's home.  But that incident is not

a part of this lawsuit; it is the subject of Sanchez's first action in *Sanchez v. Rash, et al.*, No. CV 17-156-SPW-TJC.  Chris Friedel did not perform any drug tests on that occasion, and he had no further involvement in Sanchez's case.

### b.  September 14, 2017

Sanchez alleges that she went to a State facility for a visit with her child on September 14, 2017.  As of this date, the state court had apparently not yet ordered drug testing.  According to Sanchez's allegations, a social worker, believing Sanchez was "drunk," called Neil Friedel to come to the State facility and conduct an on-the-spot alcohol test.  He also tested her for drugs, "unknown to her and without her consent."  Second Am. Compl. (Doc. 38) at 3.  Neil Friedel agrees he went to a State facility and administered a drug test on this day, although he says Sanchez consented.  *See* N. Friedel Aff. (Doc. 43-1) at 2 ¶¶ 7–8.  Sanchez also alleges that Neil Friedel heard the social worker say Sanchez could not see her child unless she submitted to Neil Friedel's test.  *See* Sanchez Aff. (Doc. 48-6) at 12–13.

These allegations support an inference that Neil Friedel acted as "a willful participant in joint action with the State or its agents," *Dennis v. Sparks*, 449 U.S. 24, 28 (1980), when he decided, on his own initiative, to administer both the alcohol test requested by the social worker and a drug test that was not requested. *See also, e.g.*, *Lugar*, 457 U.S. at 924–27 (finding private party acted under color

20

of law when it deprived plaintiff of his property by obtaining prejudgment writ of attachment from court clerk and having sheriff execute it).  Friedel administered the tests at a State facility, apparently with the knowledge and endorsement of the social worker but beyond the bounds of her request.  Arguably, there was overt, official involvement by CPS in the administration of the tests on this occasion, meaning that Neil Friedel, on this occasion, acted under color of state law.

The Court does not know enough about this incident[7] to say that Neil Friedel *did* act under color of state law on September 14, 2017.  The parties have presented very little evidence to show what happened.  But Defendants have not met their burden of showing that Neil Friedel did *not* act under color of state law on this occasion.

### c.  Order for Testing and Selection of Friedel LLC

After September 14, the state court ordered Sanchez to submit to drug testing, and CPS selected Friedel LLC as the testing provider.  Sanchez alleges she "was told her child wouldn't be seen if she did not use them [Friedel] specifically. Plaintiff attempted multiple times to end the contact and each time was threatened with loss of child contact."  Second Am. Compl. (Doc. 38) at 15.

There is no evidence that CPS and Friedel colluded to ensure Friedel was

---

[7]  The allegation that Friedel photographed Sanchez is similarly opaque.  No comment or analysis is necessary at this time because the incident requires further development.

selected.  Sanchez does not even allege, much less point to evidence, that any of the Friedel defendants played any role in deciding whether she should be routinely tested for drug use, or in selecting Friedel LLC, or in denying Sanchez's requests to be reassigned to a different provider.  There is undisputed evidence that the selection process occurred in the usual way.  CPS used other providers, and Friedel had other public and private clients.  Friedel LLC was not required to accept referrals from CPS.  *See* N. Friedel Aff. (Doc 43-1) at 1–2 ¶¶ 4–5, 2–3 ¶¶ 11–15, 3 ¶¶ 19–21.

Similarly, CPS was not involved in any way in administering the tests. Except for the impromptu test on September 14, 2017, it appears that all other tests were administered at the Friedels' place of business.  No state official or employee was present.  Sanchez's tests were conducted in the same manner that Friedel conducted all of its drug tests, without direction, oversight, control, or participation by a state actor.  *See id.* at 4 ¶¶ 23–26, 5 ¶¶ 32–36.

As to Sanchez's allegation that the Friedels used their waiting room to engage in religious proselytization, there is no evidence any state official or employee even knew of these efforts or the arrangement of the room, much less that CPS gave "significant encouragement, either overt or covert," to the Friedels' practice.  *See Kach*, 589 F.3d at 648 (internal quotation marks and citation omitted).

Sanchez points to Neil and Rich Friedels' attendance at a "family engagement meeting"[8] to provide drug testing results when the results could have been reported in writing.  She infers they attended because they intended to participate in CPS's decision whether to return Sanchez's child to her custody. *See, e.g.*, Pl. SDF (Doc. 48) at 19–21 ¶ 36, 28–29 ¶ 41; Pl. Exhs. (Doc. 48-2) at 8 (listing Neil and Rich Friedel "as a participant of a family group decision making meeting").[9]  The evidence is undisputed they did not participate in CPS's decision. See N. Friedel Aff. (Doc. 43-1) at 5–6 ¶¶ 37–40.  Even Sanchez agrees they reported that Sanchez did not use drugs and then left.  *See* Pl. SDF (Doc. 48) at 20–21 ¶ 36.  Even if it is unusual for a testing provider to attend a family engagement meeting, *cf. id.* at 28 ¶ 41, the Friedels' attendance at Sanchez's meeting does not demonstrate joint action.

Finally, the Second Amended Complaint alleges the Friedels:

> have close relationships with multiple individuals employees at Cps Defendant Neil is married to A therapist with direct information to Families in crisis and social workers with in Yellowstone . The friels associate closely with social workers  These social workers receive bonus & incentives federal funding when they obtain placements and meet the deadlines required . The social workers profit 3:1 match's financially for the debts [defendants'] bank account.  The Defendants Friedel's began to work closer with social workers as there agency was bailing out individuals who now would have Cps cases.

---

[8]  This appears to be what Sanchez means by "fem."

[9]  She suggests their attendance might have meant Friedel actually did have a contract with CPS.  *See* Pl. SDF at 14 ¶ 22.  This is speculation, not evidence.

Second Am. Compl. (Doc. 38) at 4 [sic throughout].

If accompanied by evidence the Friedels played a role in bringing cases to CPS's attention, or in getting cases assigned to them for testing or other services, or in extending the duration of parental cases, these allegations could support an inference of joint action or conspiracy.  But there is no such evidence.  The facts alleged are unremarkable.  They provide no reason to suspect "[t]he State . . . so far insinuated itself into a position of interdependence" with Friedel "that it must be recognized as a joint participant" in Friedels' testing and alleged religious proselytization.  *See Burton*, 365 U.S. at 725.

In neither Friedel LLC's administration of the tests, nor in its selection or continuation as the testing provider, was there joint action with CPS.  The prospect that Sanchez would lose custody of her child "if she did not use them [Friedel] specifically" was no more than the prospect that she would lose her child if she did not test with the provider selected by CPS, regardless of who the provider was.  Apart from the incident on September 14, involving Neil Friedel and possibly Friedel LLC, Sanchez's allegations do not meet the test for joint action or conspiracy.

### 3.  Governmental Compulsion or Coercion

A private party that must carry out a specific mandate from a governmental actor is acting under color of state law.  *See Sutton v. Providence St. Joseph Med.*

24

*Ctr.*, 192 F.3d 826, 836–43 (9th Cir. 1999) (distinguishing a private party following law of general applicability, which is not acting under color of state law, from private party following specific direction by a governmental actor, which is); *Carlin Comms., Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291, 1295 (9th Cir. 1987) (where State of Arizona exercised coercive power over defendant by threatening to prosecute it if it did not cut off plaintiff's service, defendant acted under color of state law).  The relationship between CPS and the Friedels was consensual, not coercive or compulsive.  The Friedels could have declined to test anyone, including Sanchez, without suffering any penalty.

True, Sanchez shows a degree of coercion when she alleges she was required to submit to drug testing and that she was "forced" to wear sweat patches, with no option to be tested by other means.  She also alleges that wearing the patch was invasive and caused her excessive worry as she waited for results or tried to keep the patch from becoming contaminated.  *See* Second Am. Compl. (Doc. 38) at 2, 7; Sanchez Aff. (Doc. 48-6) at 16–17; *see also, e.g.*, *United States v. Lifshitz*, 369 F.3d 173, 192–93 (2d Cir. 2004) (discussing need to balance privacy interests of person monitored and intrusiveness and efficacy of method of monitoring).

But these allegations concern decisions made exclusively by CPS with no evident participation or input from the Friedels.  To whatever extent Sanchez alleges her sweat patches were applied or maintained in a way that injured her, she

is challenging the wholly private action of the Friedels, carried out with no participation or input by CPS.  In sum, CPS compelled *Sanchez* to submit to drug testing via sweat patches.  CPS did not compel or coerce the *Friedels* to do anything.  Thus, Sanchez's allegations do not meet the governmental coercion or compulsion test.

### 4. Government Nexus

"Arguably the most vague of the four approaches, the nexus test asks whether there is a such a close nexus between the State and the challenged action that the seemingly private behavior may be fairly treated as that of the State itself." *Kirtley*, 326 F.3d at 1094–95 (quoting *Brentwood Acad.*, 531 U.S. at 295) (internal quotation marks omitted).  As in *Kirtley*, Friedel LLC was "appointed by a state actor," "paid by the state," and "subject to regulation by state law."  *See id*. at 1095.  But these facts were not enough in *Kirtley* to show that Rainey acted under color of state law.

Here, there is no indication state officials or employees played any role in the management or control of the Friedels' business.  For all the reasons already discussed, there is no evidence of "entwinement," either bottom up or top down, between Friedel LLC or the individual Friedels and a governmental entity or government officials or employees.  *See Brentwood Acad.*, 531 U.S. at 299–300. Both CPS and Friedel LLC worked with other providers and clients; there was no

26

contract between them; neither was required to use the services or answer the call of the other; and each worked separately and independently of the other's tasks and efforts.

Nevertheless, two clusters of facts are significant in Sanchez's eyes but have not yet been mentioned in the analysis: Defendants' ways of presenting themselves to the public, and the tools they have chosen to use in their trade.

### a. Defendants' Public Self-Representations

Sanchez refers to "fridel website, google ads, rich fridel post comments."[10] Pl. SDF (Doc. 48) at 15 ¶ 25. She does not specify what exhibits she has in mind, but four pages of her exhibits appear to fit this reference. (The Court does not see a comment posted by Rich Friedel.) Two pages, *see* Pl. Exhs. (Doc. 48-2) at 11, 13, appear to be printouts from Friedel LLC's website. One lists items under the headings of "Process Serving" and "Private Investigation," and the other describes "Drager Drug Testing." A Facebook page lists "Public & Government Service" as the nature of the business at "Friedel LLC." *See* Pl. Exhs. at 14. Another Facebook page appears to belong to Douglas Friedel, who "removed one drug patch from Sanchez" on one occasion, supervised by Neil. *See* N. Friedel Aff.

---

[10] Most of Sanchez's references to websites or documents on the web are hearsay and lack foundation and authenticity. In this context, however, they are *not* hearsay. Sanchez offers them not to prove the truth of anything but to show how the Defendants portray themselves. The Court will assume, for purposes of the summary judgment motion only, that Sanchez could lay foundation and establish authenticity by testifying how and when she found them on the internet.

(Doc. 43-1) at 5 ¶ 33; D. Friedel Aff. (Doc. 43-4) at 2 ¶ 3.  The Facebook page

shows a makeshift logo of a badge with a five-point star and federal eagle in the

center.  The words "Bail Enforcement Agent" are discernible around the perimeter,

and the webpage shows the name "Douglas R Friedel" printed below the badge.

The "badge" does have a distinctly governmental look to it.  The

government nexus test, however, requires convincing mutuality between a

governmental and a private entity.  Sanchez adduces no reason to believe a

governmental actor knew about this badge or representation, much less endorsed it.

Nor did Douglas act or purport to act as a bail agent or government officer in

Sanchez's case.  His involvement with her was limited to the supervised removal

of one drug patch, and she does not allege he wore a badge while doing it.  The

Court sees nothing on Sanchez's printouts from Friedel LLC's website suggesting

it acts under color of state law.  Describing Friedel LLC on Facebook as a business

engaged in "Public and Government Service" suggests some connection with

government, but again, there is no evidence CPS knew about and in some way

endorsed Friedel LLC's self-description.

These representations fail to support an inference that Friedel LLC and a

government entity are so interconnected or interdependent that the private entity

may be called a state actor.

### b.  Defendants' Tools of Trade

Sanchez is concerned that the Friedels use a testing device described on a website as intended "for law enforcement use only."  She also contends that sweat patches are not reliable.  *See, e.g.*, Second Am. Compl. (Doc. 38) at 6–14; Pl. Exhs. (Doc. 48-2) at 21.

The question posed by the summary judgment motion is whether the Friedel defendants acted under color of state law.  A person who goes to a website and purchases a device described as "for law enforcement use only" is not representing to a third party, such as Sanchez, that he is a law enforcement agent.  Still less is a governmental entity representing that the person is its agent or directing or endorsing his activity.

Sanchez's other evidentiary submissions, *see* Statements re: Reliability of Sweat Patches (Docs. 48-3, 48-4, 48-5); Letters to PharmChem Stockholders (Docs. 48-7, 48-8, 48-9, 48-10), lack appropriate foundation and authenticity.  Even if that problem were corrected, they are not relevant to the question of whether any of the Defendants acted under color of state law.

### c.  Conclusion

The government nexus test requires the Court to broadly consider everything about the relationship between the Friedel defendants and governmental actors.  The workaday, arm's-length relationship between the Friedel defendants and Child

Protective Services, or even government in general, is not remotely comparable to the high degree of mutuality and interconnection between public high school officials and Tennessee's Secondary School Athletic Association.  *See Brentwood Acad.*, 531 U.S. at 297–98, 299–300.  Sanchez's allegations do not meet the government nexus test.

### 5.  Conclusion:  Under Color of Law

With respect to the testing that occurred on September 14, 2017, Defendant Neil Friedel does not carry the burden of showing he did not act under color of state law.  But, with respect to all other allegations against them, Defendants establish they did not act under color of state law and are entitled to judgment.

Neil Friedel is a member of Friedel LLC, but Sanchez has not fairly alleged the entity itself took any unconstitutional action under color of state law.  Neil's involvement does not make Friedel LLC liable because the doctrine of *respondeat superior* does not apply to claims under 42 U.S.C. § 1983.  *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139–40 (9th Cir. 2012).  All Defendants except Neil Friedel are entitled to dismissal.

### V.  Claims Under State Law

The Second Amended Complaint alleges various claims under state law.  The Court lacks original jurisdiction over them because diversity is lacking.  *See* 28 U.S.C. § 1332; Order (Doc. 7) at 3.

The Court has recommended dismissal of all but one of the federal claims over which it has original federal-question jurisdiction.  *See* 28 U.S.C. § 1331. That claim is restricted to Neil Friedel's acts on September 14, 2017.

Under 28 U.S.C. § 1367(c)(1), (2), the Court "may decline to exercise supplement jurisdiction over a claim . . . if –

    (1) the claim raises a novel or complex issue of State law, [or]

    (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction . . . .

If the District Court adopts the recommendation, Sanchez's claims under state law will substantially predominate over her federal claim.  The state law claims also appear to be novel, as they pose issues concerning a drug testing provider's obligations, if any, to a person referred by CPS for testing.  Consequently, the state law claims should be dismissed without prejudice.  *See* 28 U.S.C. § 1367(d).

## VI.  The CPS File

If the District Court adopts the recommendation, this action will present one issue: is Neil Friedel liable to Sanchez under 42 U.S.C. § 1983 based on his actions on September 14, 2017, in administering drug testing?  This question arises from the allegations of the second amended complaint (Doc. 38).  It is clearer and narrower than the bevy of indistinct issues posed by the prior controlling pleading. *See* Am. Compl. (Doc. 12-1).  In other words, the ground underlying Sanchez's "objection" to release of the CPS file has shifted.  In addition, Sanchez's

31

"Objection" (Doc. 32) to the release of the CPS file would be more properly presented in the form of either a motion for protective order or a motion to compel discovery.

For these reasons, the Court will deny the "Objection" at this time. This ruling, however, should not be construed as indicating whether the file is or is not relevant or whether it must or cannot be disclosed. If the issue still requires judicial resolution, it must be raised in a specific and appropriate way.

### VII.  Sanchez's Motion for Extension of Time

On January 27, 2020, Sanchez moved for an extension of time "to respond to the topics that were assigned to be responded to."  Mot. for Extension (Doc. 50) at 1.  The Court does not know what that means.  In support of this motion, Sanchez filed (Doc. 52) a DVD containing video clips of evidence that, based on her description of them, might be relevant to her other cases, but not this case.

On January 27, 2020, Sanchez filed a response (Doc. 51) to a "motion to stay discovery by friedel."   Resp. (Doc. 51) at 1 (caption).  No such motion is filed in this case.

On November 27, 2019, before any of these documents were filed, the Court stayed the case schedule. *See* Order (Doc. 47) at 4 ¶ 8.  As Sanchez fails to explain what deadline she seeks to extend or objects to extending, any request is denied.

The Court has specifically considered whether Sanchez's requests should be

construed under Federal Rule of Civil Procedure 56(d), but she does not suggest she was unable to respond adequately to the summary judgment motion.

## VIII.  Sanchez's Motion to Continue and Supplement

This Court will not rule on Sanchez's motion and supplement (Docs. 54, 55), seeking a continuance of this matter for reasons related to the COVID-19 pandemic.  The District Court should decide whether to extend Sanchez's time to object.

Based on the foregoing, the Court enters the following:

## ORDER

1.  The clerk shall correct the spelling of the name "Friedel" throughout the caption of the case.

2.  Sanchez's motion to strike or objection to release of file (Doc. 32) is **DENIED**.

3.  Sanchez's motion for extension of time and response to an unfiled motion for extension of time (Docs. 50, 51) are **DENIED**.

4.  Ruling on Sanchez's motion to continue (Docs. 54, 55) is **RESERVED** for the District Court's consideration.

5.  The case schedule remains **STAYED** pending the District Court's ruling on this Findings and Recommendation.

/ / /

The Court also enters the following:

## RECOMMENDATION

1.  Sanchez's civil RICO claim should be **DISMISSED WITH PREJUDICE** for failure to state a claim and as frivolous.

2.  The civil rights claims Sanchez abandoned in her Second Amended Complaint, *see* Compl. (Doc. 2) at 10 para. 2; Am. Compl. (Doc. 12-1) at 1 para. 2, 4 para. 3, should be **DISMISSED WITH PREJUDICE.**

3.  The Friedels' motion for summary judgment (Doc. 41) should be **DENIED** as to the testing Neil Friedel administered on September 14, 2017, and **GRANTED** as to all other claims under 42 U.S.C. § 1983.

4.  The District Court should **DECLINE** supplemental jurisdiction over state-law claims.

5.  As no claims remain against Defendants Friedel LLC, Douglas Friedel, Rich Friedel, and Chris Friedel, and as the deadline for amendment of the pleadings has passed, these Defendants should be **DISMISSED WITH PREJUDICE** from this action.

## NOTICE OF RIGHT TO OBJECT
## TO FINDINGS & RECOMMENDATION
## AND CONSEQUENCES OF FAILURE TO OBJECT

The parties may object to the Findings and Recommendations within 14

days.  *See* 28 U.S.C. § 636(b)(1).[11]  Failure to timely file written objections may

bar a de novo determination by the district judge and/or waive the right to appeal.

   Plaintiff must immediately advise the Court of any change in her mailing or

email address.  Failure to do so may result in dismissal of the action without notice

to her.

   DATED this 22nd day of July, 2020.


                              */s/ Timothy J. Cavan*
                              Timothy J. Cavan
                              United States Magistrate Judge

---

[11]  This deadline allows a party to act within 14 days after the Findings and
Recommendation is "served."  Federal Rule of Civil Procedure 6(d) allows three additional days
after the period would otherwise expire.